# IN THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF MISSOURI SOUTHERN DIVISION

In the Matter of the Seizure of:

Approximately $300,000 in United States currency, currently in the custody of the Missouri State Highway Patrol

Case No. 17-SW-2026WPR

I, Mark A. Hooten, being first duly sworn, do depose and state that:

1. I am a Special Agent with the Drug Enforcement Administration (DEA), and have been so employed since October 1996. I am currently assigned to the Resident Office in Springfield, Missouri. As a Special Agent, I am authorized to conduct investigations of, and to make arrests and seizures for, offenses enumerated in the Controlled Substances Act, Title 21, United States Code. I have been a sworn law enforcement officer for approximately 31 years. I have specialized training in the investigation of controlled substance cases and have personally participated in hundreds of controlled substance investigations.

2. I present this affidavit in support of an application for the issuance of a seizure warrant for approximately $300,000 in United States currency.

3. The following information is based upon my personal knowledge and investigation in this case, as well as information made known to me by Missouri State Highway Patrol (MSHP) Sergeants Matt Funderburk and Gary Braden.

4. On March 4, 2017, at approximately 7:00 a.m., MSHP Sergeant Funderburk conducted a traffic stop on a red Ford Focus for speeding westbound on United States Interstate 44 at the 65-mile marker in Greene County, within the Western District of Missouri. The Ford was bearing Ohio registration GUU-8385, and is registered to PV Holding Corporation, 18923 Maplewood Avenue, Cleveland, Ohio 44135.

5. Sergeant Funderburk identified the driver through a California Driver's License as Uriel BELTRAN (BELTRAN), and the passenger through a California Identification Card as Catherine MEZA-AMADOR (MEZA-AMADOR). BELTRAN provided Sergeant Funderburk with documents showing that the Ford was a rental vehicle from Avis Car Rental. Sergeant Funderburk reviewed the rental agreement and learned that BELTRAN rented the Ford on March 3, 2017, at 7:07 a.m. from the Newark, New Jersey, airport. The Ford was scheduled to be returned to the Sky Harbor Airport in Phoenix, Arizona, on March 4, 2017, by 7:30 a.m.

6. BELTRAN told Sergeant Funderburk that he lives in California, but drove to the airport in Phoenix, Arizona, where he met MEZA-AMADOR, who BELTRAN identified as his cousin, so the two of them could fly together to Newark, New Jersey, to visit family. BELTRAN stated that MEZA-AMADOR lives in Mexico, and said that he and MEZA-AMADOR drove to the Phoenix, Arizona, airport because it was a good "in between" spot to meet.

7. BELTRAN told Sergeant Funderburk that he did not like flying, which was why he was driving back to Arizona, and that his mother was going to pick him up at the airport in Phoenix and then drive him back to his residence in California. BELTRAN stated that MEZA-AMADOR's mother was going to travel from Mexico to Phoenix to pick up MEZA-AMADOR and return her to Mexico.

8. During the conversation with BELTRAN, Sergeant Funderburk noticed that he was nervous and visibly shaking. Sergeant Funderburk became suspicious of the trip and asked for consent to search the Ford, which BELTRAN denied.

9. Sergeant Funderburk then called Sergeant Braden and requested that he respond to his (Sergeant Funderburk's) location. Sergeant Braden, who has a narcotics-trained canine,

2

was working a short distance from Sergeant Funderburk, and was able to arrive at Sergeant Funderburk's location in approximately five minutes. Upon arrival, and after being debriefed by Sergeant Funderburk, Sergeant Braden deployed his narcotics-trained canine, Iax, around the Ford. Iax responded in a positive manner for the presence of narcotics. Both Sergeants Funderburk and Braden then conducted a probable cause search of the Ford. During that search, in the back seat, the sergeants found in a black backpack and shoe box approximately $300,000 in United States currency wrapped in rubber bands inside Ziploc-style bags.

10. BELTRAN, MEZA-AMADOR, and the Ford were transported to the MSHP Troop D Headquarters in Springfield, Missouri, where the Ford could be thoroughly searched. DEA Task Force Officer (TFO) Dan Banasik and myself were contacted, and we both responded to Troop D Headquarters to assist.

11. When I arrived, I was debriefed by Sergeant Funderburk, and was told that both BELTRAN and MEZA-AMADOR were willing to speak with officers and spoke fluent English. Sergeant Braden told me that upon arrival at Troop D Headquarters, he deployed Iax around the currency, and Iax again responded in a positive manner for the presence of narcotics.

12. Sergeant Funderburk provided me with two airline baggage claim tags from United Airlines seized from the Ford. One of the tags was in BELTRAN's name, and the other was in MEZA-AMADOR's name. Both tags showed that the bags were checked at the Phoenix, Arizona, airport on March 2, 2017, with a final destination of Newark, New Jersey.

13. Sergeant Funderburk also provided me with a sheet of notebook paper which was located in the front passenger door map compartment. This sheet of paper had the following handwritten notations: 100 x 688 = $68,800, 50 x 358 = $17,900, 20 x 10,521 = $216,420, 10 x

3

56 = $560, 5 x 0 = 0, 1 x 0 = 0, and $303,680. These notations are believed to be a reference to the denominations of United States currency in the Ford and the total value of the United States currency. It should be noted that all of these calculations are correct except for the calculation of 20 x 10,521. That total is actually $210,420.

14. TFO Banasik and I interviewed BELTRAN. Prior to the interview, I identified myself as a DEA Agent, and identified TFO Banasik as a Sergeant with the MSHP, but assigned to the DEA Task Force. I advised BELTRAN that neither he nor MEZA-AMADOR were under arrest and neither were going to be arrested. BELTRAN was told that if he did not wish to answer any questions, he did not have to, and that he and MEZA-AMADOR were free to continue their trip. BELTRAN stated that he would be willing to talk about the United States currency found in the Ford.

15. BELTRAN identified MEZA-AMADOR as his cousin, and stated that a few days earlier, MEZA-AMADOR called him and asked him if he would be willing to take a trip with her to New Jersey to pick up some "stuff." BELTRAN stated that he did not know if MEZA-AMADOR was talking about picking up money or drugs, but believed it was one of the two. BELTRAN stated that he agreed to accompany BELTRAN on the trip.

16. BELTRAN continued by stating that he lives in Yucaipa, California, and that MEZA-AMADOR lives in Mexico. In an effort to meet halfway, BELTRAN decided to drive to the airport in Phoenix, Arizona, meet MEZA-AMADOR, and fly together to New Jersey. BELTRAN stated that he did not know how MEZA-AMADOR got to Phoenix, Arizona. BELTRAN stated that he and MEZA-AMADOR purchased airline tickets for a flight leaving Phoenix, Arizona, to Newark, New Jersey on March 2, 2017, with each of them paying for their

4

own ticket. BELTRAN stated that once they arrived in New Jersey, he rented the Ford, in which they were subsequently stopped, because he was over 25 years of age and MEZA-AMADOR did not have a valid driver's license.

17. BELTRAN added that once they arrived in New Jersey, MEZA-AMADOR contacted an unknown person using her cellular telephone, and this person provided MEZA-AMADOR with an address to where he and MEZA-AMADOR were to go. BELTRAN looked in his cellular phone and provided myself and TFO Banasik with an address of 592 Fort Washington Avenue, Manhattan, New York, as the address given to him by MEZA-AMADOR. BELTRAN stated that he entered the address into his cellular telephone's GPS application, and he and MEZA-AMADOR drove to that address, which BELTRAN said was a pizza restaurant. I conducted an Internet search of the address, and the search revealed that the address is a grocery store called Associated Supermarket.

18. BELTRAN stated that once they arrived at the address, they were approached by a young Hispanic male who placed the backpack and shoe box into the back seat of the Ford. BELTRAN stated that the Hispanic male did not introduce himself to either himself (BELTRAN) or MEZA-AMADOR.

19. BELTRAN stated that the back pack and shoe box remained in the back seat of the Ford until they were stopped by law enforcement, and at no time did either he or MEZA-AMADOR open the packages to see what was inside.

20. BELTRAN stated that the United States currency did not belong to him or MEZA-AMADOR, and that he did not know to whom the United States currency was to be delivered. BELTRAN further stated that he has never taken a trip like this before, but was

5

expecting to be paid $500 to $1,000 for making the trip. BELTRAN was asked what he thought the money was for, and BELTRAN replied, "Probably drugs."

21. I noticed that, according to the baggage claim tickets seized from the Ford, BELTRAN and MEZA-AMADOR flew to Newark, New Jersey, on March 2, 2017, but the rental car agreement indicated he rented the car on March 3, 2017. BELTRAN did not have an explanation for this discrepancy.

22. TFO Banasik and I then interviewed MEZA-AMADOR. Prior to the interview, I identified myself as a DEA Agent and identified TFO Banasik as a Sergeant with the MSHP, but assigned to the DEA Task Force. I advised MEZA-AMADOR that neither she nor BELTRAN were under arrest and neither was going to be arrested. MEZA-AMADOR was told that if she did not wish to answer any questions, she did not have to, and that she and BELTRAN would be free to continue their trip. MEZA-AMADOR stated that she would be willing to talk about the United States currency found in the Ford.

23. MEZA-AMADOR explained that she had a cousin by the name of "Cindy" who lives in Mexico, and described "Cindy" as her second or third cousin. MEZA-AMADOR could not provide any additional information to assist in the identification of "Cindy."

24. MEZA-AMADOR stated that "Cindy" called her and asked her if she (MEZA-AMADOR) would fly to New Jersey to pick up a "package," and MEZA-AMADOR agreed. MEZA-AMADOR stated that she did not know if the package that she was to pick up would contain money or drugs, but believed it to be one of the two. MEZA-AMADOR further believed that she was going to be paid to make this trip, but did not know how much.

25. MEZA-AMADOR then called BELTRAN, whom she referred to as her cousin,

6

and asked BELTRAN if he would make the trip with her, and BELTRAN agreed. MEZA-AMADOR stated that BELTRAN lives in California and said she lives in Mexico, so the two of them decided to travel to Phoenix, Arizona, to meet and then fly to New Jersey. MEZA-AMADOR stated that BELTRAN drove from California to Arizona and she took a taxi from Nogales, Mexico, to Phoenix, Arizona.

26. MEZA-AMADOR stated that "Cindy" gave her a telephone number to call once she arrived in New Jersey, and the person who answered the phone would tell MEZA-AMADOR where she needed to go. MEZA-AMADOR provided telephone number (646) 956-9101 as the number given to her by "Cindy."

27. MEZA-AMADOR stated that once she and BELTRAN arrived in Phoenix, they each purchased their own airline tickets and flew to New Jersey. Once they arrived in New Jersey, BELTRAN rented the Ford because she (MEZA-AMADOR) did not have a driver's license. MEZA-AMADOR then sent a text message to the number given to her by "Cindy," and after several hours, she received a response with an address to where she and BELTRAN were to go. MEZA-AMADOR, however, did not remember the address. She did remember that she gave the address to BELTRAN to put into his cellular telephone's GPS application.

28. MEZA-AMADOR stated that she and BELTRAN drove to the provided address where they were met by a young Hispanic male, whom MEZA-AMADOR had never met before. The Hispanic male placed the back pack and shoe box containing the United States currency into the back seat of the car and instructed them to drive back to Arizona. The young Hispanic male also gave her the sheet of notebook paper with the United States currency notations, and told her to keep the paper with the packages and deliver the paper with the packages. MEZA-AMADOR

placed the sheet of notebook paper in the map holder of the front passenger door.

29. MEZA-AMADOR stated that when she and BELTRAN returned to Phoenix they were to get a hotel room, leave the car in the parking lot, and contact "Cindy" to tell her where they were.

30. MEZA-AMADOR stated that the United States currency did not belong to her or BELTRAN, and that she did not know to whom the United States currency was to be delivered. MEZA-AMADOR further stated that she has never taken a trip like this before.

31. MEZA-AMADOR added that when she met with the young Hispanic male, he took her cellular telephone and deleted all calls and text messages from her telephone, but for some reason, he did not delete his own telephone number. As with BELTRAN, MEZA-AMADOR had no explanation for the fact that the baggage claims tickets indicated they flew to New Jersey on March 2, 2017, but did not rent the car until March 3, 2017.

32. MEZA-AMADOR was asked if she thought the United States currency could be for drugs, and MEZA-AMADOR replied, "Yes."

33. The MSHP maintained custody of the United States currency pending an investigation. In accordance with its policies, the MSHP contacted the Greene County, Missouri, Prosecutor's Office and was advised the Greene County, Missouri, Prosecutor's Office would not be filing a state forfeiture action under the Missouri's Criminal Activity Forfeiture Act (CAFA), as the specific set of circumstances did not meet CAFA criteria, and no such action has been filed.

34. Based on the above, I believe the approximately $300,000 in United States currency was furnished or intended to be furnished in exchange for a controlled substance, is

proceeds traceable to such an exchange, or was used to facilitate the commission of a violation of Sub-Chapter II of Chapter 13, Title 21, United States Code, and, therefore, is subject to forfeiture to the United States pursuant to 21 U.S.C. § 881 (a)(6) (civil forfeiture) and 21 U.S.C. § 853 (criminal forfeiture).

The facts set forth in this affidavit are true and correct to the best of my knowledge and belief.

*Mark A. Hooten*
Special Agent Mark A. Hooten
Drug Enforcement Administration

Subscribed and sworn to before me in my presence on this 10th day of March, 2017.

*David P. Rush*
David P. Rush
United States Magistrate Judge